AOC-E-105
Rev. 9-14
Sum Code: CI

Commonwealth of Kentucky
Court of Justice    *Courts.ky.gov*

CR 4.02; Cr Official Form 1



## CIVIL SUMMONS

Case #: **15-CI-00703**
Court:   **CIRCUIT**
County:  **FAYETTE**

---

*Plaintiff,* ROBBINS, CARLIN , ET AL VS. NEW CINGULAR WIRELESS D/B/A AT&T MOBILITY, *Defendant*

TO:  **NEW CINGULAR WIRELESS D/B/A AT&T MOBILITY**
     **CT CORPORATION SYSTEMS**
     **306 WEST MAIN ST., SUITE 512**
     **FRANKFORT, KY 40601**



EXHIBIT
A

The Commonwealth of Kentucky to the above-named Defendant(s):

You are hereby notified that a **legal action has been filed against you** in this Court demanding relief as shown on the document delivered to you with this Summons. **Unless a written defense is made by you or by an attorney on your behalf within twenty (20) days** following the day this paper is delivered to you, judgment by default may be taken against you for the relief demanded in the attached complaint.

The name(s) and address(es) of the party or parties demanding relief against you or his/her (their) attorney(s) are shown on the document delivered to you with this Summons.

/s/ Vincent Riggs, Fayette Circuit Clerk
Date: **02/26/2015**

---

### Proof of Service

This Summons was:

☐ Served by delivering a true copy and the Complaint (or other initiating document)

To: _____

☐ Not Served because: _____

Date: _____, 20_____    _____
                                     Served By
                                     _____
                                     Title

---

Summons ID: @00000643987
CIRCUIT: 15-CI-00703 Certified Mail
ROBBINS, CARLIN , ET AL VS. NEW CINGULAR WIRELESS D/B/A AT&T MOBILITY



Page 1 of 1



Presiding Judge: HON. JAMES D. ISHMAEL, JR. (622224)

CI : 000001 of 000001

FAYETTE

# CI   15-CI-00703

ROBBINS, CARLIN, ET AL VS. NEW
CINGULAR WIRELESS D/B/A AT&T

**COMPLAINT**

eFiled: 2/26/2015 ID: 7481
By: DOROTHY T     RUSH
Pages total: 14     Image size: 0.22 MB



Filed / Entered
2/26/2015
FAYETTE
Vincent Riggs, Fayette Circuit Clerk
BY: _____ D.C.

Case Number: 15-CI-00703



9 of 14 thumbnails shown





FILED
ATTEST, VINCENT RIGGS, CLERK

MAR 1 0 2015

FAYETTE CIRCUIT CLERK
BY _____ DEPUTY

15-CI-703

| Number | COMPLETE THIS SECTION ON DELIVERY |
|---|---|
| | A. Received by (Please Print Clearly)   B. Date of Delivery |
| | *Melissa Moore* |
| | C. Signature |
| | X **Melissa Moore** ☐ Agent ☐ Addressee |
| 9008 9115 5677 1637 | D. Is delivery address different from item 1? ☐ Yes |
| Type CERTIFIED MAIL™ | If YES, enter delivery address below: ☐ No |
| ed Delivery? *(Extra Fee)* ☐ Yes | |
| Addressed to: | |

CORPORATION SYSTEMS
WEST MAIN STREET
TE 512
NKFORT, KY 40601
CI-703 ON BEHALF OF NEW CINGULAR
WIRELESS, DBA AT & T

3811, January 2005         Domestic Return Receipt



KENTUCKY COURT OF JUSTICE

### Commonwealth of Kentucky
### Fayette County
### Vincent Riggs
### Circuit Court Clerk

Receipt Number: 27-0007705-A

DATE: 02/27/2015

TIME: 08:52 AM

*** (Z) OTHER TYPE RECEIPT ***

CASE NO: 15-CI-00703

RECEIVED FROM: DOROTHY T    RUSH

ACCOUNT OF: DOROTHY T    RUSH

Party Name:

Robbins, Corlin VS New Cingular Wireless   OBA/P701

| | | |
|---|---|---|
| 1. | Civil Filing Fee (Q) | 115.00 |
| 2. | ATJ Fee (1) | 20.00 |
| 3. | Court Technology MCFO(K(CT)) | 10.00 |
| 4. | Library Fee (L) | 1.00 |
| 5. | Att Tax Fee MCFO(K(Q)) | 5.00 |
| 6. | Court Facilities Fee (J) | 25.00 |
| 7. | Jury Demand /12 CS(W(M)) | 60.00 |
| 8. | Postage/Cert. Mail MCFO(K(H)) | 13.43 |
| 9. | Copy-Photocopy CS(W(F)) | 4.90 |

TOTAL:                     $254.33

CREDIT CARD:               $254.33

***DIFF:                     0.00

*** Credit Card Invoice #: 46702450

Prepared By: Web_Payment

**MCFO=Money Collected for Others

** CS=Charge for Services

Filing (KYCOURTS)                    Page 1 of 2



FAYETTE

# CI   15-CI-00703

ROBBINS, CARLIN, ET AL VS. NEW
CINGULAR WIRELESS D/B/A AT&T

**Summons**

FILED / ENTERED
2/26/2015
FAYETTE
Vincent Riggs, Fayette Circuit Clerk
BY: _____ D.C.

eFiled: 2/26/2015 ID: 7481
By: DOROTHY T    RUSH
Pages total: 1    Image size: 0.26 MB

Case Number: 15-CI-00703

CIVIL SUMMONS

Case #: 15-CI-00703
Court: CIRCUIT
County: FAYETTE

Plaintiff, ROBBINS, CARLIN , ET AL VS. NEW CINGULAR WIRELESS D/B/A AT&T MOBILITY, Defendant

TO: NEW CINGULAR WIRELESS D/B/A AT&T MOBILITY
CT CORPORATION SYSTEMS
306 WEST MAIN ST., SUITE 512
FRANKFORT, KY 40601

The Commonwealth of Kentucky to the above-named Defendant(s):

eFiled

**US Postal Service®**
**Certified Mail™ Receipt**
Domestic Mail Only
No Insurance Coverage Provided

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ |

Postmark
Here    2/27/2015

7196 9008 9115 5677 1637

Sent To:
CT CORPORATION SYSTEMS
306 WEST MAIN STREET
SUITE 512
FRANKFORT, KY  40601
15-CI-703 ON BEHALF OF NEW CINGULAR
WIRELESS; DBA AT & T

PS Form 3800, January 2005    US Postal Service®    **Certified Mail™ Receipt**

# Case History

Generated: 03/23/15   1:09:06PM

## ROBBINS, CARLIN, ET AL VS. NEW CINGULAR WIRELESS D/B/A AT&T

### Case# 15-CI-00703

|  |  |
|---|---|
| County | FAYETTE |
| Court | CIRCUIT Court |
| Opening Judge | HON. JAMES D. ISHMAEL, JR. |
| Current Judge | |
| Closing Judge | |

Page #

| Date | Event | Amount | |
|---|---|---|---|
| 02/26/2015 | **Case Filed**<br>PROPERTY RIGHTS | | |
| 02/26/2015 | **Summons Filed - NEW CINGULAR**   @00000643987<br>**WIRELESS D/B/A AT&T**<br>**MOBILITY**<br>CERTIFIED MAIL<br>*RTN TO OFFICE ON 03/10/2015 SIGNED  BY MELISSA MOORE DATE OF SERVICE  WAS NOT PROVIDED* | | |
| 02/26/2015 | **Document Filed**<br>COMPLAINT / PETITION<br>AP | | |
| 02/26/2015 | **Document Filed**<br>EXHIBIT<br>AP | | |
| 02/27/2015 | **Document Filed**<br>RECEIPT<br>*REC#27-0007705-A*<br>*$254.33* | | |
| 02/27/2015 | **Monetary Event**<br>Monetary Event<br>Civil Filing Fee | $ 115.00 | |
| 02/27/2015 | **Monetary Event**<br>Monetary Event<br>ATJ Fee | $ 20.00 | |
| 02/27/2015 | **Monetary Event**<br>Monetary Event<br>Collected For Others (Court Technology) | $ 10.00 | |
| 02/27/2015 | **Monetary Event**<br>Monetary Event<br>Library Fee | $ 1.00 | |
| 02/27/2015 | **Monetary Event**<br>Monetary Event<br>Collected For Others (Att Tax Fee) | $ 5.00 | |
| 02/27/2015 | **Monetary Event**<br>Monetary Event<br>Court Facilities Fee | $ 25.00 | |
| 02/27/2015 | **Monetary Event**<br>Monetary Event<br>Charges For Services (Jury Demand /12) | $ 60.00 | |
| 02/27/2015 | **Monetary Event**<br>Monetary Event<br>Collected For Others (Postage/Cert. Mail) | $ 13.43 | |
| 02/27/2015 | **Monetary Event**<br>Monetary Event<br>Charges For Services (Copy-Photocopy) | $ 4.90 | |
| 03/10/2015 | **Summons Served/Recalled - NEW**   @00000643987<br>**CINGULAR WIRELESS D/B/A**<br>**AT&T MOBILITY**<br>CERTIFIED MAIL<br>*RTN TO OFFICE ON 03/10/2015 SIGNED  BY MELISSA MOORE DATE OF SERVICE  WAS NOT PROVIDED* | | |

**ROBBINS, CARLIN, ET AL VS. NEW CINGULAR WIRELESS D/B/A AT&T**

**Case# 15-CI-00703**

**County** FAYETTE
**Court** CIRCUIT Court
**Opening Judge** HON. JAMES D. ISHMAEL, JR.
**Current Judge**
**Closing Judge**

Page #

*ELECTRONICALLY FILED*

**COMMONWEALTH OF KENTUCKY**
**FAYETTE CIRCUIT COURT**
**DIVISION ____**
**CIVIL ACTION NO. _____**

CARLIN ROBBINS and                                    PLAINTIFFS/APPELLANTS
REBECCA LUTZ

v.                                    **COMPLAINT**

NEW CINGULAR WIRELESS PCS, LLC                        DEFENDANTS/APPELLEES
d/b/a AT&T MOBILITY

Serve: CT Corporation Systems
        306 West Main Street, Suite 512
        Frankfort, Kentucky 40601

---

Come now the Plaintiffs, CARLIN ROBBINS AND REBECCA LUTZ (hereinafter "Plaintiffs"), by and through counsel, and for their Complaint, state as follows:

## INTRODUCTION

1.      This action is brought on behalf of Plaintiffs and a putative class of individuals who live within 1640 feet (500 meters) of the subject cellular communications proposed to be constructed by New Cingular Wireless PCS, LLC, dba AT&T Mobility ("AT&T") to seek injunctive relief and/or recover damages caused by the siting, construction, and operation of the proposed cell tower.

## JURISDICTION

2.      The Fayette Circuit Court has jurisdiction and venue to hear claims against the Defendant where the actions complained of are taking place in Fayette County, Kentucky, and the

proposed cellular communications tower will be sited, constructed, and operated in Fayette County.

## PARTIES

3.      Carlin Robbins is a citizen and resident of Fayette County, Kentucky who resides and at all relevant times herein has resided at 334 Sheridan Drive, Lexington, Kentucky 40503. Carlin Robbins and her property are being and will be further injured by construction and operation of a cellular communications tower located at 302 Southland Drive.

4.      Rebecca Lutz is a citizen and resident of Fayette County, Kentucky who resides and at all relevant times resided at 331 Sheridan Drive, Lexington, Kentucky 40503. Rebecca Lutz and her property are being and will be further injured by construction and operation of a cellular communications tower located at 302 Southland Drive.

5.      New Cingular Wireless PCS, LLC d//b/a AT&T Mobility ("AT&T") is the wireless service provided who is seeking to site, construct, and operate the cellular communications tower to be located at 302 Southland Drive.   AT&T is a foreign limited liability company registered to do business in the Commonwealth of Kentucky.

## CLASS ALLEGATIONS

6.      Plaintiffs may request class certification in this matter. As such, this action is also brought by the named representative Plaintiffs pursuant to Kentucky Rule of Civil Procedure 23.02. A class action may be appropriate and necessary in this instance because the Defendant has engaged in conduct that affects a large number of property owners in the area.

7.      The class is defined as follows. However, Plaintiffs reserve the right to amend the class definition as more information is ascertained:

ALL PERSONS WHO CURRENTLY LIVE WITHIN 1,640 FEET (500 METERS) OF THE SITE OF THE PROPOSED CELLULAR COMMUNICATIONS TOWER

8.    The putative class is so numerous that joinder of all members would be impracticable. The size of the putative is believed to be in excess of 200 individuals. The exact size of the putative class and the identity of the members of the class are ascertainable from records from the Fayette County PVA and Fayette County Clerk's office.

9.    There are substantial questions of law and fact common to the claims of the putative class against the Defendant and the claim of each of the class members against the Defendant. Questions of law governing, and dispositive of, the putative class against the Defendant, are precisely the same as the questions of law governing, and dispositive of, each class member's claims against the Defendant. The questions of fact governing, and dispositive of, the claims of the putative class against the Defendant are precisely the same as the questions of fact governing, and dispositive of, the claims of each class member against the Defendant.

10.    Questions of law and fact common to the putative class predominate over questions affecting only individual members.

11.    The claims of the Plaintiffs in this action are typical of the claims of the putative class members. The claims of each Plaintiff are typical, in all important respects, of the claims of each and all of the class members and the class representative's claims arise out of the same common nucleus of operative facts, and unlawful conduct by Defendant, as the claims of the class members.

12.    Plaintiffs have obtained competent and experienced class counsel and will fairly and adequately protect the interests of the members of the putative class. The class representatives have no interests adverse to the class members.

13.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy, because joinder of all members is impracticable. Litigating the

3

claims of all class members in a single forum would prevent inconsistent rulings. Inconsistent rulings could make the future conduct of the plaintiffs and Defendant difficult. The class representatives are residents that live within 1,640 feet (500 meters) of the site of the proposed cellular communications tower and will suffer excessive noise, light, exposure to electromagnetic fields and other damages as a result of the construction and operation of the cellular communications tower. In addition, because the damages suffered by an individual class member may be relatively modest compared to the expense and burden of individual litigation, it would be impracticable for members of the putative class to seek individual redress for the wrongful conduct alleged herein. A class action will achieve economies of time, effort and expenses and promote uniformity of decision as to other persons similarly situated, without sacrificing procedural fairness.

14.     There will be no undue difficulty in the management of this litigation as a class action.

## FACTS COMMON TO ALL COUNTS

15.     The Federal Telecommunications Act was "enacted with the primary purpose of increasing competition in the telecommunications industry, and to help telecommunications companies expand the availability of wireless services." *Can You See Me Now?* 19 Nat. Resources & Envtl. L. 213, 214-215 (2004-2005). Essentially, the Act was intended to maintain local control over siting locations while prohibiting "unreasonable discrimination" and failure to provide cellular service." *Id.* at 218.

16.     KRS § 100.987 was adopted, in part, to authorize planning units to "plan for and regulate the siting of cellular antenna towers." Pursuant to this Statute, the LFUCG adopted Article 25 "Telecommunications Towers" of the Zoning Ordinances, to "provide for cellular

telecommunications towers in appropriate locations throughout the community at sites that provide adequate cellular telecommunication service while protecting the public, preserving the character and value of the surrounding property, and protecting the view from residential areas." LFUCG Zoning Ordinance 25-1.

17.    Pursuant to the Zoning Ordinance, AT&T applied to the LFUCG for permission to construct a one hundred and twenty five (125 foot) cellular antenna tower with a five (5) foot lightning arrestor at 302 Southland Drive, Lexington, Kentucky in an area zoned B-1 (neighborhood business) on August 21, 2014. The proposed location would also house the ground equipment associated with the cellular communications tower. The proposed location is bounded by both R-2 (Two Family Residential) and R-1C (Single Family Residential) to the east/northeast and southwest, respectively. The cellular communications tower will dominate the view shed from residential properties and emit harmful light, noise, and radio and microwaves.

18.    The public hearing was held on December 11, 2014. The Planning Commission ultimately voted to approve the application. Rather than require AT&T to offer different alternative designs, the Planning Commission determined that no alternative design would be required because no parties involved thought the monopine was appropriate, as discussed below.

19.    An appeal by two property owners (Plaintiffs herein) injured by the action of the Planning Commission then followed. That appeal remains pending.

20.    The Staff Report noted that "it is not an ideal situation" to construct and operate a cellular communications tower at 302 Southland Drive due to the proximity to residences located on Sheridan Drive considering the intent of Article 25 of the Zoning Ordinance to "protect[] the public; preserv[e] the character and value of surrounding property; and protect[] the view from residential areas." Staff Report dated December 11, 2014 at 4. The Staff Report also stated that

"whenever possible, and to the largest extent feasible, an applicant should use government properties for siting a tower." *Id.* at 2.

21.     The cellular communications tower to be constructed and operated will be located eighty (80) feet from residential properties. The Staff Report remarked that this was "relatively close." *Id.* at 1. The Staff Report determined that the tower could be located "further from the residential properties along Sheridan Drive, although it could only be moved another 25 to 30 feet from those properties and remain in the lease area." *Id.* The Staff Report also conceded that, although such a placement would require a setback variance would be required "but it would be from a commercial property, which would be more acceptable, due to its currently proposed proximity to the residential properties, and would likely be supported by staff." *Id.*

22.     The Staff Report detailed aesthetic issues to be considered in constructing and operating the tower. "Although its profile (both height and diameter) will be minimized, and the tower will not be visible from all properties in the surrounding neighborhoods, the presence of a 125-foot tower will undoubtedly affect the view from many residential properties in all directions, as well as much of Southland Drive, which is contrary to the intent of Article 25." *Id.* at 4-5. Due to the proximity to residential properties, the Staff Report recommended an alternative tower design. *Id.* at 5. The design recommended by the Staff was one modeled on the alternative design in use on Tates Creek Road. The design at that location "disguise[d] its function (a church tower that was constructed to look like part of the church building, which contains the actual cellular tower). This was done to protect the view shed along Tates Creek Road and its surrounding neighborhoods, and is recommended for the subject property (or the main Oleika property) as well. An architectural feature/design that would appear to be part of the Temple building (or possibly the Dollar General Store/Incredipet building) would minimize the impact of what many

4F1EDA0B-4BF7-4A04-B33D-CCBCCF272EE3 : 000006 of 000047

surrounding property owners believe would be a negative, overwhelming presence in the neighborhood." *Id.* In response, AT&T, acting in bad faith, submitted an alternative design to make the cellular tower look like an large, metal *pine tree*. This "monopine" was absurd and did not accomplish a "disguise" at all. Due to opposition to the monopine and the lack of reasonable alternative designs tendered by AT&T that incorporated the design into nearby businesses, the Planning Commission did not require use of an alternative tower design whatsoever.

23.     The need for a cellular communications tower at this specific location is in dispute based on by documents filed by AT&T after the Uniform Application was filed. The initial Radio Frequency Report attempted to justify the need for a tower at this location to "close" the 3G coverage gap in the area. The Report on its face demonstrated that the 3G coverage gap primarily existed to the Southeast of this site (near Zandale). AT&T then filed two subsequent Radio Frequency reports in response to citizen opposition, and disclosed that it intends, at some point in the future, to construct and operate another cellular communications tower located in the 3G coverage gap to the Southeast of Southland Drive: at the "Zandale" site.

24.     The attached report of Mary Clay, MAI estimated that cell tower construction can cause a decrease in neighboring property values anywhere from two to twenty-one percent (2% - 21%) depending upon a variety of factors. Mary Clay Report at 14-16.

25.     The Mary Clay, MAI report catalogues the negative health impacts of cell towers. Scientists across the world have found links between radio frequency electromagnetic field exposure and serious health problems such as leukemia and brain cancer.  Mary Clay Report at 2. "8 out of 10 studies evaluated through PubMed had reported **increased prevalence of adverse neurobehavioral symptoms or cancer in populations living at distances <500 m (1,640 feet) from cell phone towers.**" *Id.* at 13 (emphasis original). "The 2004 German study conducted by

Horst Eger, Klaus Uwe Hagen, Birgitt Lucas, Peter Vogel and Helmut Voit, from 1994-2004, revealed that **living within 400 meters (1,312 feet) of a cell tower increased the risk of developing cancer by thee-hundred percent (300%).**" Mary Clay Report at 10 (emphasis original). Eighty (80) feet equals approximately twenty-four (24) meters. Additionally, studies have found that exposure to radio frequency electromagnetic fields decreased survival rates in children with leukemia. *Id.* at 12. Radio frequency electromagnetic field exposure causes significant genetic damage. *Id.* Some studies suggest that females are more at risk to negative impacts from these fields than men. *Id.* Another study "documented that cell phone towers alter brain function causing a lack of concentration, irritability, difficulty sleeping and lack of appetite." *Id.* The tower's distance from residential populations is critical given that "electro-pollution strength is determined by the inverse square of the distance" meaning that "a person who moves twice as close to a cell tower experiences four times the radiation." *Id.* at 14.

26.     Primarily, the studies cited in paragraph 25, above, originate from European countries. However, "[i]n a 2002 California study, 'Executive Study of the California EMF Risk Evaluation for Policymakers and the Public,' three scientists who worked for the California Department of Health Sciences were directed to study whether EMFs were associated with health problems. The three scientists unanimously concluded that the likelihood of a causal relationship between EMFs and childhood leukemia is ninety-five percent (95%)." *Id.* at 13. A 2010 study out of the United States, recommended that "[a]s a general guideline, cell base stations should not be located less than 1,500 feet (~500 m) from the population, and at a height of about 150 (~50 m)." *Id.* The study further recommended efficient tower, and base equipment, placement to limit exposure to "unnecessary levels of RFR." *Id.*

4F1EDA0B-4BF7-4A04-833D-CCBCCF272EE3 : 000008 of 000047

27.     Furthermore, the United States authorized a dramatically higher limit for public exposure to RF/MW Radiation than several counties in Europe and New Zealand. The limit in the United States can be as much as five thousand (5,000) times higher. *Id.* at 5. New Zealand authorized fifty (50) microwatts per centimeter squared – the United States authorized five hundred and eighty (580) microwatts per centimeter squared. Even Russia limited exposure to ten (10) microwatts per centimeter squared. *Id.*

In addition to negative health impacts, cellular communications towers produce excessive noise and light that would otherwise not be observed in this neighborhood.

## CAUSES OF ACTION

### COUNT I

### NEGLIGENCE

1.     The above numbered paragraphs are incorporated herein as if set forth fully.

2.     The Defendant owes a duty of ordinary care to the Plaintiffs, and the Defendant has negligently breached their duty of ordinary care, and caused injury to the Plaintiffs as a direct and proximate result of said negligence, and the Plaintiffs are entitled to compensation for the damages caused or contributed to by the negligence of each of the Defendant.

3.     By reason of Defendant's actions, Plaintiff's property has been damaged.

4.     By reason of Defendant's actions, Plaintiffs have been personally injured and suffered emotional distress.

5.     Based on the foregoing, the Defendant is liable to Plaintiffs and the other members of the putative class in an amount to be determined at trial, plus interest, penalties, and costs.

### COUNT II

## NEGLIGENCE PER SE

6.     The above numbered paragraphs are incorporated herein as if set forth fully.

7.     The Defendants are in violation of certain statutes, regulations, and ordinances,, to prevent the conditions caused by the siting, construction, and operation of a cell tower from causing harm to Plaintiffs and Plaintiffs' property.  Such violation constitutes negligence *per se*, conclusively proving such negligence.

8.     Plaintiffs are within the class of persons for whose benefit the statutes, regulations, and ordinances statutes were enacted, and the harm to Plaintiffs is the harm which the statutes, regulations, and acts were designed to prevent. Plaintiffs are entitled to compensation for the damages caused or contributed to by the negligence *per se* of the Defendant.

9.     By reason of Defendant's actions, Plaintiff's property has been damaged.

10.     By reason of Defendant's actions, Plaintiffs have been personally injured and suffered emotional distress.

11.     Based on the foregoing, the Defendant is liable to Plaintiffs and the other members of the putative class in an amount to be determined at trial, plus interest, penalties, and costs.

## COUNT III

## PRIVATE NUISANCE - PERMANENT

12.     The above numbered paragraphs are incorporated herein as if set forth fully.

13.     The siting, construction, and operation of a cellular communications tower by the Defendant will cause excessive noise and light and will have a significant adverse impact on the health and well-being of neighboring residents and causes an unreasonable and substantial annoyance to the occupants of Plaintiffs' properties.

14.     The siting, construction, and operation of a cellular communications tower under these conditions would cause substantial annoyance to a person of ordinary health and normal sensitivities.

15.     As this nuisance is a private nuisance that (a) cannot be corrected or abated at a reasonable expense to the owner and (b) is relatively enduring and not likely to be abated voluntarily or by court order, this is a permanent nuisance.

16.     By reason of those conditions the fair market value of said Plaintiffs' properties have been materially reduced.

17.     By reason of those conditions, Plaintiffs have been personally injured and suffered emotional distress.

18.     Based on the foregoing, the Defendant is liable to Plaintiffs and the other members of the putative class in an amount to be determined at trial, plus interest, penalties, and costs.

## COUNT IV

## PRIVATE NUISANCE - TEMPORARY

19.     The above numbered paragraphs are incorporated herein as if set forth fully.

20.     The construction and operation of a cellular communications tower by the Defendant will cause excessive noise and light and will have a significant adverse impact on the health and well-being of neighboring residents and causes an unreasonable and substantial annoyance to the occupants of Plaintiffs' properties.

21.     The construction and operation of a cellular communications tower under these conditions would cause substantial annoyance to a person of ordinary health and normal sensitivities.

22.     As this nuisance is a private nuisance that (a) can be corrected or abated at a reasonable expense to the owner or (b) is not relatively enduring and is likely to be abated voluntarily or by court order, this nuisance is temporary.

23.     By reason of those conditions the fair market rental value of said Plaintiffs' properties have been materially reduced.

24.     By reason of those conditions, Plaintiffs have been personally injured and suffered emotional distress.

25.     Based on the foregoing, the Defendant is liable to Plaintiffs and the other members of the putative class in an amount to be determined at trial, plus interest, penalties, and costs.

## COUNT V

## GROSS NEGLIGENCE - RECOVERY OF PUNITIVE
## AND EXEMPLARY DAMAGES

26.     The above numbered paragraphs are incorporated herein as if set forth fully.

27.     Defendant's actions were grossly negligent, and willful and wanton in their conduct towards Plaintiffs. Further, Defendant acted with oppression and malice toward Plaintiffs causing injury to Plaintiffs and their property entitling Plaintiffs to punitive and exemplary damages.

28.     Plaintiffs are also entitled to punitive damages pursuant to KRS 411.560 (4).

29.     Based on the foregoing, the Defendants are liable to Plaintiffs and the other members of the putative class in an amount to be determined at trial, plus interest, penalties, and costs.

**WHEREFORE**, Plaintiffs and the members of the putative class demand judgment:

(1)     That this Court certify this action as a class action pursuant to the class definition herein;

12

(2)     That Plaintiffs may proceed as Class Representatives of the Class and that their counsel may proceed as Class Counsel;

(3)     On Count I against Defendant in an amount to be determined at trial, plus attorneys' fees and costs;

(4)     On Count II against Defendant in an amount to be determined at trial, plus attorneys' fees and costs;

(5)     On Count III against Defendant in an amount to be determined at trial,, attorneys' fees and costs;

(6)     On Count IV against Defendant in an amount to be determined at trial, plus attorneys' fees and costs;

(7)     On Count V against Defendant in an amount to be determined at trial, plus, attorneys' fees and costs;

(8)     That this matter be advanced on the Court's calendar and docketed for an early hearing on the request for injunctive relief;

(9)     That this Court Enter a Temporary Injunction prohibiting the Defendants from constructing and operating a cellular communications tower during the pendency of this case;

(10)    That this Court Enter a Permanent Injunction prohibiting the Defendant from constructing and operating a cellular communications tower at 302 Southland permanently;

(11)    A trial by jury; and

(12)    Such other and further relief as to the Court may deem just and proper.


Respectfully Submitted,

/s/ W. Henry Graddy, IV
W. Henry Graddy, IV

13

Dorothy T. Rush
W. H. Graddy & Associates
137 North Main Street
Versailles, Kentucky 40383
(859) 879-0020
(859) 855-3628 – facsimile

Randal A. Strobo
Downey Strobo PLLC
239 South 5th Street, Suite 917
Louisville, Kentucky 40202
(502) 290-9751

14



4F1EDA0B-4BF7-4A04-B33D-CCBCCF272EE3 : 000015 of 000047

MARY MCCLINTON CLAY, MAI
218 Main Street
Paris, Kentucky  40361
859-987-5698


December 10, 2014


Hon. W. Henry Graddy, IV
W.H. Graddy & Associates
137 N. Main Street
Versailles, KY

Dear Mr. Graddy:

Attached is the expansion of the 2012 high voltage transmission line (HVTL) damage study I prepared for you to include cellular towers. This study was part of two farm property division analysis of which one farm included a cell tower.

Cell tower damage is consistent with that of HVTL in that the damage is determined by placement on the property as it affects the utility of the tract.  Diminution in value ranges from minimal to significant based on the impact of the structure. Studies cited in the report have determined that any distance less than 1,500 feet is detrimental to health. Moreover, because electro-pollution strength is determined by the inverse square of the distance, a person who moves twice as close to a cell tower experiences four times the radiation.[1]

Indications are that the average damage is 20.0 percent. My empirical case studies range from 12.0 to 50.0 percent.

Very Truly Yours,

Mary McClinton Clay, MAI

---

[1] http://www.naturalnews.com/z044464

4F1EDA0B-4BF7-4A04-B33D-CCBCCF272EE3 : 000016 of 0f0047

# LITERATURE REVIEW OF
# CELL TOWER DAMAGE STUDIES

## INTRODUCTION

Cell phones first became commercially available in the 1980s. By April 2014 there were 327.6 million mobile phones for the 317.9 million U.S. population. This rapid growth has created siting issues for telecommunications companies with respect to tower construction in an effort to meet the needs of the public. Concerns from the public include proximity to dwellings, health effects of electromagnetic field (EMF) exposure, as well as the aesthetic dis-amenities of the structures.

Cell towers are typically tall steel poles or lattice structures, support antennas that receive and transmit radiofrequency (RF) signals that are connected to equipment stored in a cabinet at the base of the tower. The equipment in the cabinet includes radio transmitters and receivers, DC power and rectifiers, back-up batteries and cell site routers. Power is feed to the cabinet by an underground cable. The technically correct term is Base Transceiver Station (BTS).

Cellular phones are sophisticated two-way radios that use ultrahigh frequency (UHF) radio waves to communicate information. The information is transferred between a cellular phone and a network of low-powered transceivers, the cell towers. The development of Smartphones has increased the number of cell towers because they require about 35 percent more coverage than a standard cell phone. According to Forbes, Smartphone penetration has gone well beyond 50 percent of all adult Americans.

Controversy remains between scientists, the cell phone industry and the general public about the biological effects of exposure to EMFs produced by cell towers. This uncertainty has resulted in growing opposition from property owners affected by the siting of

1

these structures, who perceive there is a potential health risk or fear that it could have a detrimental impact on the value of their homes.[1] However, the U.S. Food and Drug Administration, as well as the telecommunication industry maintain that that cell towers do not pose a health risk to those living around them.

By 1990, thousands of EMF studies had been conducted worldwide, with published research appearing in journals as early as the 1940s. Of these at least two dozen epidemiological studies on humans indicated a link between EMFs and serious health problems, including leukemia. In response to public pressure, the Environmental Protection Agency (EPA) began reviewing and evaluating the scientific data. In a March 1990 draft report, the EPA recommended EMFs to be classified as "probable human carcinogens." However, when the report was published, the EPA had removed EMFs classification as a possible carcinogen after pressure from industry and computer lobbyists. Currently, the EPA's stance remains that the EMF research is "inconclusive."[2]

Moreover, a 2006 report from the World Health Organization (WHO) noted that after fifty years of human exposure to RF signals from FM radio and television, which are similar to cell phone tower, there are no known negative effects on health.[3] However, in May 2011, the International Agency for Research on Cancer (IARC), a committee of 27 scientists from 14 different countries working on behalf of WHO, concluded that radio frequency electromagnetic fields (inclusive of cell towers) were possibly carcinogenic to humans based on studies showing an increased risk of lethal brain cancer associated with wireless phone use. They classified EMFs into the 2B category, which includes the pesticide DDT, lead gasoline engine exhaust, burning coal and dry cleaning chemicals.

---

[1] Bond, Sandy, et al, *Towers, Turbines and Transmission Lines: Impacts on Property Values*, (West Sussex, UK: Wiley-Blackwell, 2013): 126.
[2] Levitt, Blake, *Electromagnetic Fields: A Consumer's Guide to the Issues and How to Protect Ourselves*, (Lincoln, NE:iUniverse, Inc.): 18.
[3] http://www.naturalnews.com/z032539.

As an example of the dichotomy of positions relative to EMF harm to humans, the following is an announcement of the IARC findings from an industry source.[4] "The World Health Organization's (WHO) advisory committee, the International Agency for Research on Cancer (IARC), decided that radio frequency (RF) electromagnetic fields (EMF) should be classified as a 'Group 2B possible carcinogenic' – in the same group as coffee, pickled vegetables, coconut oil and the carpentry profession, in general."

. There has been a dearth of studies documenting the potential damage to property values from cell towers, compared to similar vertical structures such as high voltage transmission lines (HVTL). This is the result of the **cellular industry's claims that there are no harmful effects and the media's support of these claims.** Public exposure to health effects has been suppressed because media outlets in the United States are controlled by only six corporations: Time Warner, Disney, Murdoch's News Corporation, Bertelsmann of Germany, Viacom (formerly CBS) and General Electric's NBC.

"The cell phone industry is one of the fastest growing and strongest global industries in the world today and may even be stronger than the pharmaceutical industry. As a multi-trillion dollar industry whose advertising dollars support and heavily influence media around the world, this industry is capable of wielding great power by making sizable political donations and through persistent lobbing efforts that influence and sometimes even directly shape government policies.[5]

**This is evidenced by the Telecommunications Act of 1996. Section 704, written by Congress with the help of the telecommunications industry, prevents local governments from considering adverse health and environmental effects when regulating cell towers.**

---

[4] Schmidt, Ken, "Cell Towers are as Carcinogenic as Pickled Vegetables," (htt;://ww.steelintheair.com/Blog/2014/07).
[5] Mercola, "How Science Can Deceive You about Your Cell Phone," http://articles.mercola.com, December 10, 2012.

3

This Act was the first major overhaul of the telecommunications law since the Communications Act of 1934. The goal of the 1996 deregulation law was to let anyone enter any communications business and to let any communications business compete in any market against any other, recognizing the value of maintaining strong national commitment of universal service as originally embodied with the 1934 Act. The 1996 law relies on increased competition for development and enhancement of new services in nationwide broadcasting and cable, telecommunications, information and video services. The policy's intention for consumers (residents, business, and governmental authorities) is to receive higher quality services at a lower cost, and to encourage the rapid development of new telecommunication technologies.[6]

The 1996 Act imposed the following six main zoning and land use limitations upon state and local governments which preempted any inconsistent provision of local planning or zoning boards of review pursuant to the Supremacy Clause of the U.S. Constitution:[7]

1. Municipalities Cannot Prohibit Wireless Facilities.

2. Competitors Must Be Treated Equally.

3. **Health Concerns May Not Be Considered.**
   The Act expressly prohibits local governments or planning or zoning boards from considering the health of environmental risks associated with wireless communications facilities. Congress has vested exclusive jurisdiction to set and enforce radio frequency emissions standards in the FCC.

4. Denials Must Be Based on Substantial Evidence.

5. Decisions Must Be Rendered Within a Reasonable Period of Time.

6. No Barriers to Entry.

The Federal Communications Commission (FCC) whose job it is to protect the public, has adopted policies favorable to the wireless industry. Moreover, the **FCC has adopted RF emissions standards at levels as much as 5,000 times higher than maximum levels deemed safe by other countries.**

---

[6] Andolfo, Thomas S., "Telecommunications: The Wireless Personal Communications Services (PSC) Industry," *The Appraisal Journal* (July 2001): 333.
[7] Ibid., 333.

### International Limits for Public Exposure to RF/MW Radiation

| | |
|---|---|
| Austria | 0.1 microwatts per centimeter squared |
| Switzerland | 4.2 microwatts per centimeter squared |
| China | 6.6 microwatts per centimeter squared |
| Italy | 10 microwatts per centimeter squared |
| Russia | 10 microwatts per centimeter squared |
| New Zealand | 50 microwatts per centimeter squared |
| United States | 580 microwatts per centimeter squared |

By comparison, after meeting with 300 public health officials from around the world to discuss the potential adverse impacts from RF emissions from cell towers, the Canadian Medial Office of Health issued a report recommending that Canada reduce the permissible limit for cell tower RF radiation to 0.1 w/m2 – a level 5,800 times lower than what the FCC permits in the United States.[8]

According to Steel in the Air, Inc.: "The FCCs opinion is: 'Radiofrequency emissions from antennas used for cellular and PCS (personal communications service) transmissions result in exposure level on the ground that are typically thousands of times below safety limits."[9]

With respect to FCC regulation, only towers above 200 feet tall are required to be registered. According to the FCC, even some that are this height or taller are not registered because the tower owners have not provided the information to the FCC. The FCC does not keep tract of individual antennas on towers; and only check of there is a complaint about a

---

[8] http://www.toronto.ca/health/hphe/pdf/cell_tower_conference.pdf
[9] Schmidt, Ken, "Cell Towers are as Carcinogenic as Pickled Vegetables," (htt;://ww.steelintheair.com/Blog/2014/07).

facility. It is the licensee's responsibility to take into account the fields that are already existing before they add their antennas to the tower.[10]

## CELL TOWER LEASE HOLD ESTATE

Cell tower leases are typically ground leases between the property owner and the company (wireless carrier or tower company) that erects the tower on the property. The ground lease specifies the actual territorial boundaries that will be utilized erecting the tower.

The four major wireless carriers (tenants) are AT&T (Cingular), Verizon Wireless, T-Mobile (Omnipoint) and Sprint Nextel. Also US Cellular, Cricket. Tower Owners or managers are American Tower, Crown Castle or SBA Communications.

With respect to lease rates, according to Steel in the Air, Sprint tends to pay more for their average lease than other carriers do followed by AT&T and MetroPCS (now T-Mobile). The next highest group is Clearwire and Verison, followed by the lowest paying, US Cellular.

The average cell site lease rent varies depending upon the type of lease that it is and the type tower that is proposed. Other considerations include location, carrier, coverage, zoning regulations, economic conditions, term of the lease, number of carriers using the cell site, potential competing locations for siting the cell tower, and proximity to other cell sites.

For example, the average lease rate (considering all cellular leases in the U.S.) in one data base is approximately $900 per month, according to one lease consultant who represents landowners exclusively.[11]

A typical lease would have an original 5 year term with mandatory renewals every five years for 3 or 4 more terms of 5 years with a 3 percent annual escalation rate.

With respect to escalation rates, according to Steel in the Air:

---

[10] http://anticelltowerlawyers.com/links/government-related-infomat.html.
[11] http://www.steelintheair.com

6

Escalation rates range from 1% to 8%, although most people don't see anywhere near the upside of that range. If you examine the last 10years, you will see that the consumer price index (a measure of inflation) has averaged 2.3% per year. This means that to maintain the same value of your lease you would need to receive annual escalation of at least 2.3%. From 1990 to 1999, the average CPI was 3.1% per year. Over the last 100 years, it has averaged 3.2%. Recently, the wireless carriers have been pushing hard to reduce the escalation rates of their leases, offering 7.5% over five years or 2% per year.

AT&Ts cell site lease is typically five years with four automatic renewals for additional five-year terms unless AT&T properly notifies the landlord, of its intention not to renew. Unless both the lessor and lessee specify otherwise, the lease automatically continues after the fourth term for one-year terms at the same rent until the lease agreement is terminated. AT&T is entitled to 24 hour access to the leased site and is granted an easement for such access at no additional cost. AT&T may remove the equipment at any time and within 120 days of the cell site lease termination. AT&T is responsible for removing the equipment and restoring the site to its original condition.  AT&T has the right to assign or sublease the cell site without the landlord's consent. If the landlord decides to sell the property, he must notify AT&T since any sale is subject to AT&T's rights. [12]

Most leases contain termination rights only for the tenant/wireless carrier. They also contain first right of first refusal clauses that limit the lessor's (e.g., the landowner's) right to sell the property or the lease without giving the lessee (e.g., the tower owner/wireless carrier) the right to match the offer. According to Steel in the Air, "In most leases, the language in the Right of First Refusal is overly broad and could end up being very restrictive in the event of a regular sale of the property."

Cell site leases, regardless of the stated maximum term, can typically be terminated by their tenants in 30 to 90 days. This cancellation clause seriously limits the value of the lease and ability to rely on the rents for any length of time greater than the stated termination period.

---

[12] http://www.celltownerattorney.com/att-cell-site-lease

Risks inherent in cell tower leases include the elimination of redundant cell cites due to merger and acquisition. Mergers and acquisitions continue to take place in the wireless industry, and many merged entities have announced their intention to eliminate redundant cell site across their service area. On the other hand, the increased need for cell towers due to technological changes in cell phones more than offset that threat.

Although most cell tower arrangements with property owners begin as lease hold estates, the trend is toward buyouts in the form of leases or easements. Aggregation firms have been contacting site owners for a decade to buy the rent they receive from cell phone/wireless carriers and tower companies on their property. These transactions are made either as easements and assignments or pure assignments of rents. The rents are purchased by the aggregator either in perpetuity (preferred) or for fixed periods of time ranging typically from 20 to 50+ years. After the expiration of the rent assignment (for other than perpetual terms), the rents typically revert back to the property owner.

The prices in the industry are typically discussed from the aggregation firm's perspective either in terms of multiples of the monthly rent amount being purchased or in terms of the yield they would obtain on the transaction if held from the term of the rent assignment.

According to Tower Capital Advisors, "In 2012, across the spectrum of tenants and domestic market, a typical lease with one of the premier tenants (AT&T, Verison) might have been purchased from a property owner by an aggregation firm for, on average, 120 X the monthly (or equivalent rent) for a 40+ year easement purchase. More recently, averages for the same leases have approached 140 X or more. To simplify, that means if his/her current rent were $1,000/month and if his/her negotiating skills ere intermediate or better, a site owner selling his/her wireless rent for 40 or more years would have been offered $120,000 growing more recently to $150,00 for their lease or more.[13]

---

[13] http://www.towercapadvisors.com/cell-site-lease-market-data

A communications easement constitutes a transfer of an interest in the real property under state law. The creation of a lease or the grant of a license, on the other hand results in a contract right to receive rent over time. The grant of an easement is usually not terminable by the owner since the grantee acquires a deeded interest in the real property itself. The grant of a license or fee, on the other hand, will be terminable upon the expiration of the lease or license term. Given the greater limitation on the owner's future use of a property subject to a perpetual easement, the grant of an easement generally commands a much greater premium than the grant of a terminable license or term lease.[14]

According to Steel in the Air, an easement for a cell tower could affect the sale of a property in the following manner:

> It could have a fairly significant impact on the property or none at all. Any buyer of the property will be taking the property subject to the easement and, depending upon the location of the tower or cell site, may or may not care. **If the tower is in a location that would impede future development (or redevelopment) of the property, the easement would have a severe impact on the willingness of a potential buyer to by the property.**[15]

The most significant risk of cell tower site leases is that of termination. The trend by tower companies and carriers – through third party agents- to try to reduce their rent payments is not going away, in fact they have become even more demanding in asking for additional concessions from cell site landlords.[16] Also, if and when the Federal Reserve stops printing money, interest rates will rise (note the 10 year Treasury increased significantly in the past few months). When that happens, the price for wireless lease assets will likely decline precipitously as return requirements of the sponsor equity of the aggregation firms will have to adjust.

## LITERATURE REVIEW

## MEDICAL STUDIES

---

[14] http://apiexchange.com/index_main.php?id+8&idz=244, "Cell Easements are Just Easements (#145)."
[15] http://www.steelintheair.com/faq.html
[16] http://www.wirelesscapital.com/what-we-do-cellular-leases/questions/

9

Though cell technology has been in existence since the late 1980s, the first study of populations near cell tower base stations was only conducted by Santini, et al in 2002. It was prompted in part by complaints of adverse effects experienced by residents living near cell base station throughout the world and increased activism by citizens and doctors.

Medical studies regarding the adverse health effects of exposure to radio frequency (RF) emissions, such as those which emanate cell towers, in the United States have been eclipsed by those from foreign countries. One conclusion reached by scientists who have conducted such studies, is that there is a causal link between RF emissions and cancer, and more specifically leukemia in children.

In a 2004 German Study entitled, "The Influence of Being Physically Near to a Cell Phone Transmission Mast on the Incidence of Cancer," the authors summarized several well-known studies:

> A series of studies available before this investigation provided evidence of health risk and increased cancer risk associated with physical proximity to radio transmission masts....In many studies an increased risk of developing leukemia has been found; in children living near transmitter antennas for Radio and Television in Hawaii; increase cancer cases and general mortality in the area of Radio and Television transmitters in Australia; and in England, 9 times more leukemia cases were diagnosed in people who live in a nearby area to transmitter antennas. In a second study, concentrating on 20 transmitters in England, a significant increase in Leukemia was found. The Cherry Study indicates an association between an increase in cancer and living in proximity to a transmitter station. According to a study of the transmitter station of Radio Vatican, there were 2.2 times more leukemia cases in children within a radius of 6 km and adult mortality from leukemia increased.

The 2004 German study conducted by Horst Eger, Klaus Uwe Hagen, Birgitt Lucas, Peter Vogel and Helmut Voit, from 1994-2004, revealed that **living within 400 meters (1,312 feet) of a cell tower increased the risk of developing cancer by thee-hundred percent (300%).**

A 2004 Israeli study, "Increased Incidence of Cancer near a Cell-Phone Transmitter Station (a cell tower)," indicated an association between increased incidence of cancer and

living in proximity to a Cell Tower. Those living near a cell tower are 4.15 times more likely to develop cancer. The authors are Ronni Wolf, MD and Danny Wolf, MD.

The 1996 the Poland Military studied, "Cancer morbidity in subjects occupationally exposed to high frequency (radiofrequency and microwave) electromagnetic radiation." The Military Center for Radiation Safety studied the cancer death rates for all career military personnel (approx. 128,000 persons each year), for the 14 year period of 1971-1985. The study revealed that persons occupationally exposed to RF emissions were nearly twice as likely to develop brain tumors, 13.9 times more likely to develop chronic myeocylic leukemia, 8.62 times more likely to develop acute myeoblastic leukemia and 5.82 times more likely to develop non-hodgkin lymphomas. The study was conducted by the Department of Biological Effect of NON-Ionizing Radiation, Center for Radiology and Radiation Safety at the Military Institute of Hygiene and Epidemiology, Warsaw, Poland.

The 1996 Australia Study, "Cancer Incidence and Mortality and Proximity to RF Emissions from TV Towers," an 18 year study of residents of 9 municipalities, from 1972-1990, revealed increase rates of childhood leukemia and death for children subjected to RF emissions from TV antennas. The authors include Bruce Hocking, Ian Gordon, Heather L. Grain and Gifford E. Hartfield.

In a subsequent 2003 study, "Decreased Rate of Survival for Childhood Leukemia in Proximity to Television Towers," Bruce Hocking and Ian Gordon documented that survival rates of children with leukemia dropped, the closer they lived to RF emitting TV antenna. The study is found in *Archives of Environmental Health*, September 2003.

The 2008 Belgium study, "Genetic Damage in Subjects Exposed to Radiofrequency Radiation," consists of a highly technical examination of 16 expert cytogenic monitoring studies performed around the world. The study confirmed that 13 of the 16 independent studies performed worldwide evidenced that RF exposed individuals suffered genetic damage. "A significant increase in chromosome breaks...was reported in all individuals." The author is Luc Verschaeve of the Scientific Institute of Public Health, Brussels, Belgium.

11

A 2009 India Study, "Biological Effects of Cell Tower Radiation on the Human Body," indicates that radiation from cell towers has been associated with an increase of brain tumors due to damage in the blood-brain barrier. Where cell antennas are mounted on rooftops, the distance to the top floor is short so the radiation levels in the top 2 floors remains very high. The author is Prof. Girish Kumar of the Electrical Engineering Department of ITT, Bombay.

A 2002 French study, "Study of the Health of People Living in the Vicinity of Mobile Phone Base Stations (Cell Towers)," examined adverse health impacts of people living in proximity to cell towers and any disparity of such impact on females as compared to males. **Based on upon adverse effects reported, the conclusion was that cell towers should not be constructed less than 300 meters (984 feet) from populations.** Disorders reported by people living within 300 meters of cell antennas included "fatigue, sleep disturbances, headaches, feeling of discomfort, difficulty concentrating, depression, memory loss, visual disruptions, irritability, hearing disruptions, skin problems, cardiovascular disorders and dizziness." The authors include R. Santini, P. Santini, J.M. Danze, P. Le Ruz and M. Seige of the National Institute of Applied Science.

In a 2007 Swedish study, "Cognitive Impairment in Rats after Long Term Exposure to GSM-900 Mobile Phone Radiation," five scientists from the Rausing Laboratory and University Hospital conducted a study within which they determined that rats exposed to RF emissions for 55 weeks suffered "impaired memory functions."

In a 2002 California study, "Executive Study of the California EMF Risk Evaluation for Policymakers and the Public," three scientists who worked for the California Department of Health Sciences were directed to study whether EMFs were associated with health problems. The three scientists unanimously concluded that the likelihood of a causal relationship between EMFs and childhood leukemia is ninety five percent (95%).

The objective of one of the most recent US studies was to review 56 studies of people living or working near cellular infrastructure that could apply to long-term low-level

12

radiofrequency radiation (RFR) exposures. Among the conclusions from the study is the following:[17]

> Citizens and municipalities often ask for firm setbacks from towers to guarantee from towers to guarantee safety. There are many variables involved with safer tower siting—such as how many providers are co-located, at what frequencies they operate, the towers height, surrounding topographical characteristics, the presence of metal objects and others. Hard and fast setbacks are difficult to recommend in all circumstances. Deployment of base stations should be kept as efficient as possible to avoid exposure of the public to unnecessary levels of RFR. **As a general guideline, cell base stations should not be located less than 1,500 feet (~ 500 m) from the population, and at a height of about 150 feet (~ 50 m).** Several of the papers previously cited indicate that symptoms lessen at that distance, despite the many variables involved. However, with new technologies being added to cell towers such as Wi-Max networks, which add significantly more power density to the environment, setback recommendations can be very unpredictable reassurance at best. New technology should be developed to reduce the energy required for effective wireless communication.
>
> In addition, **regular RFR monitoring of base stations should be considered.**

Among the most recent studies is a 2013 study published in the British Medical Journal. The study authored by Professor Enrique A. Navarro, documented that cell phone towers alter brain function causing a lack of concentration, irritability, difficulty sleeping and lack of appetite. It concluded that the severity of symptoms directly correlated to cell tower exposure levels regardless of race, income levels and other demographics.[18]

According to Navarro, "the term electromagnetic hypersensitivity has been recently introduced in discussions attributing symptoms to exposure to EMFs. A review of this topic in 2010 found that 8 of the 10 studies evaluated through PubMed had reported **increased prevalence of adverse neurobehavioral symptoms or cancer in populations living at distances < 500 m (1,640 feet) from cell phone towers." (People who live fewer than 500 meters from cell phone towers appear to be especially at risk of electromagnetic**

---

[17] Levitt, B Blake and Henry Lai, "Biological Effects from Exposure to Electromagnetic Radiation Emitted by Cell Tower Base Stations and Other Antenna Arrays," www.nrcresearchpress.com, November 5, 2010.
[18] http://www.bmjopen.com/contents/3/12/e003836.

interference with brain function. Because electro-pollution strength is determined by the inverse square of the distance, a person who moves twice as close to a cell tower experiences four times the radiation).[19]

The studies cited represent a sampling of studies throughout the world. A more comprehensive listing is represented by the Marin Project which contains a list of 600 studies about specific illnesses caused by RF emissions or EMFs.

Prof. Girish Kumar, of the department of electrical engineering, IIT Bombay, submitted a report recently on cell tower radiation documenting that towers within 160 feet of a residence emit radiation equivalent to a microwave 24 hours a day.[20]

According to the World Health Organization's International Agency or Research on Cancer (IARC), radiation emitted from mobile phones and towers are considered carcinogenic to humans and are responsible for causing glioma, which is a type of brain cancer. Towers emit radiation at higher level 24 hours a day, which makes them even more damaging than cell phones. In 2009, an inter-ministerial committee of experts on electromagnetic radiation exposure from cell phone towers states, **"it is the base stations and their antennas that are more of concern. This is because they constantly emit radio frequency."**

DECREASED REAL ESTATE VALUE: CELL TOWER STUDIES

Compared to damage studies relating to dis-amenities such as landfills, confined animal feeding operations, underground storage tanks, high voltage transmission towers, etc., a minimal number of empirical studies have been conducted on the effect of cell towers on real estate. In fact, the only three studies that exist were written solely for in part by Sandy Bond. In fact, she was one of the editors of a recently published book, *Tower, Turbines and*

---

[19] http://www.naturalnews.com/z044464
[20] http://www.phonescausebraincancer.com/living-near-cell-hone-towers-puts-you-in-grave-danger

*Transmission Lines: Impacts on Property Value.*[21] The chapter on cell towers includes two of the three studies authored by Bond.

The first is a 2002 New Zealand Case Study to determine residents' perceptions of living near cell towers in Christchurch, NZ and to quantify these effects in monetary terms according to an increasing or decreasing percentage of property values.[22] The study combined market sales analysis in tandem with opinion survey studies to measure the impact of environmental hazards on residential property values. The methods used for this study included a public opinion survey and a hedonic house price approach.

The survey results were mixed, with responses from residents ranging from having no concerns to being very concerned about proximity to a cell tower with those living close to a cell tower perceiving the sites less negatively than those who live farther away.

The second part of the study involved an econometric analysis of Christchurch property transaction data from 1992 to 2002. This research looked specifically at the impact of proximity to a cell tower on residential house prices. **"The results of the hedonic study indicate that property prices decrease, on average by around 15% after a cell tower is built. This effect generally reduces with distance from the tower and is almost negligible after c. 300m (984 ft).**[23]

This study as described in the 2013 book was also published in *The Appraisal Journal* in 2005.[24] In this article the conclusions were described as follows:

> The issue of greatest concern for survey respondents in both the case study and control areas is the impact of proximity to CPBSs on future property values. **Overall, respondents would pay from 10%-19% less to over 20% less for a property if it were in close proximity to a CPBS.**

---

[21] Bond, op. cit., vii.

[22] This study was presented at the Ninth Pacific-Rim Rea; Estate Society Conference, Brisbane, Australia, January 19-22, 2003. The paper was entitled, "The Impact of Cellular Phone Base Station Towers on Property Values."

[23] Bond, op. cit.,: 160.

[24] Bond, Sandy, PhD, and Ko-Kang Wang, "The Impact of Cell Phone Towers on House Prices in Residential Neighborhoods," *The Appraisal Journal* (Summer 2005): 256.

4F1EDA0B-4BF7-4A04-833D-CCBCCF272EE3 : 000030 of 000047

The opinion survey results were generally confirmed by the market sales analysis using a hedonic house price approach. **The result of the sales analysis show prices of properties were reduced by around 21% after a CPBS was built in the neighborhood.**

Sandy Bond also authored a study from the United States (which is included in the 2013 book previous cited). The study also appeared as a 2007 article in *The Appraisal Journal,* entitled "The effect of Distance to Cell Phone Towers on House Prices in Florida."

The study involved an analysis of residential property sales transaction data from 1990 and 2000. Both GIS and multiple regression analysis in hedonic framework were used to determine the effect of linear distance of homes to tower on residential property prices. **"The results of the research show that prices of properties decreased by just over 2%, on average, after a tower was built.** This effect generally diminished with distance from the tower and was almost negligible after about 656 feet."[25] The author surmised that the difference between this study and the previous study could be attributed to the fact that "it is possible U.S. residents simply have become accustomed to these features (HVTL, cell towers, billboards) and so notice them less."[26]

CELL TOWER STUDIES CORRELATED TO HIGH VOLTAGE TRANSMISSION LINE STUDIES

A third cell tower study by Sally Sims was included in the recently published 2013 book. This study involved cell phone towers in the United Kingdom. Because of the UK's decision to site cell towers in areas where dis-amenities already exist, it is impossible to isolate any negative effects from cell towers. Consequently, there is virtually no research being conducted on cell towers in the UK.

This study used public opinion of high voltage overhead transmission lines (HVOTLs) as a benchmark to find some indication of the likely value impacts from cell

---

[25] Bond, Sandy, "The Effect of Distance to Cell Phone Towers on House Prices in Florida," *The Appraisal Journal,* (Fall 2007): 362.
[26] Ibid., 368.

4F1EDA0B-4BF7-4A04-B33D-CCB5CCF272EE3 : 000032 of 000047

towers since previous research had already established the impacts of proximate HVOTLs.[27] "In theory, if the public expressed the same level of negativity towards both HVOTLs and cell towers, it would provide some indication as to whether home price was likely to be effected by the presence of a cell tower in residential locations."[28]

In the public attitude survey residents were asked to express their level of concern toward four environmental features: a cell tower, an overhead telephone line, an electricity substation and a HVOTL situated in a residential location. This was designed to place opinions towards cell towers in context with other environmental features. This indicated that residents who were concerned about HVOTLs had similar concerns about living near a cell tower.

The results of the study indicated that the majority of residents were "extremely" concerned about all aspects associated with both cell towers and HVOTLs with one exception: they were far less concern about the danger of a cell tower falling down. The potential health risks concern more respondents than any other factor. **A total of 50.3% stated they were "extremely" concerned about health risks from cell towers compared to 46.5% expressing "extreme" concern about health risks from a HVOTL.** Concern relating to the visual impact of a HVOTL was found to be (15%) greater than for a cell tower. [29]

"The results indicate that where a cell tower is erected in a residential location, occupiers are likely to have concerns similar to those expressed by occupiers towards living near a HVOTL. Although occupiers appear less certain about whether the cell tower would have any influence on their choice of home, **nearly 45% stated that they would not have bought their current house if it had been located near a cell tower.**"[30]

---

[27] UK: Sims and Dent 2005; New Zealand: Bond and Hopkins 2000; Canada: Des Rosiers 2002; and the US: Kinnard and Dickey 1995).
[28] Bond, op cit.:189.
[29] Ibid., 190-192.
[30] Ibid., 193.

4F1EDA0B-4BF7-4A04-B33D-CCB8CCF272EE3 : 000033 of 000047

A U.S. article published in the 2003 Assessment Journal acknowledged the lack of empirical cell tower studies and also discussed the correlation between cell towers and high voltage transmission lines (HVTL).[31]

The premise of this study was "to review the research on the impact of electric power lines and towers on property values, because they may have effects similar to wireless towers. If it is found that (1) proximity to electrical lines reduces residential property values, and (2) the factors causing reduced valuation near electric lines also apply to proximity to wireless towers, and (3) these factors have led to significant concern about proximity to wireless towers, then it may be inferred that proximity to a wireless tower may reduce residential property values."[32]

**The article cited 11 studies that indicated a diminution of values as a result of proximity to HVTLs ranging from 5.0 to 54.0 percent.** These studies identified the reduction in property values associated with HVTLs because of aesthetic and health concerns.

With respect to aesthetics, the literature states that the view enjoyed from a property may affect its value—a poor view, such as that of utility poles and high-tension wires, detracts from value. The aesthetic effects of transmission lines and wireless towers are similar. Both electric lines and wireless towers rise above building height in typical single family neighborhoods; therefore, they are visible for some distance. Unless camouflaged, these structures typically do not complement rural or suburban landscapes.

Regarding health concerns, technically, radio waves from wireless antennae differ from the electromagnetic fields produced by power lines. Although both radio waves and EMF are part of the electromagnetic spectrum, electric power in the United States operates at 60 Hz, while cellular phones operate at 860-900 MHz, and PSC phones operate at about 2000 MHz. However, the technical distinctions between radio waves emitted by wireless antennae

---

[31] McDonough, Carol C., PhD, "The Impact of Wirepless Towers on Residential Property Values, *Assessment Journal* (Summer 2003): 26.
[32] Ibid., 26.

and low-frequency EMF emitted by electric lines is not generally understood. Although the Federal government has issued guidelines regarding safe levels for both power lines and wireless antennae, there is ongoing controversy within the scientific community as to their accuracy. Because of this uncertainty, many people are fearful of living in proximity to either type of structure.

With regard to concerns about aesthetics and health effects, numerous law suits have been filed regarding the actual or proposed construction of wireless towers. Concerns about wireless towers have resulted in organizations and conferences to voice their concerns. Responding to community concerns about the negative impact of wireless towers, more than 150 municipalities have adopted temporary moratoria on wireless tower construction and most communities have enacted zoning ordinances regulating wireless tower construction.

The most recent U.S. study, which appeared in the 2013 *Appraisal Journal* regarding HVTLs, included five more recent studies than those included in the previously described McDonough study.[33] **These studies indicated results ranging from no damage in industrial properties in proximity to HVTLs to a -9.6% reduction in value for a home adjacent to a power line and facing a pylon.**

A study cited was Thomas O. Jackson's examination of rural agricultural land located in Wisconsin. "He used regression modeling to compare online (HVTL power line proximate) sales to offline sales (more than one-quarter mile from an HVTL power line). **Although the models indicated online sale prices 1.1% to 2.4% lower than offline sale prices, the differences were not statistically significant—meaning that one cannot reject the null hypothesis of no power line price effect.**"[34]

Significantly, the Jackson article provides something that none of the other studies even addressed, much less attempted to measure was, that it "**provides guidance for identifying variations in types of power line intersections—such as edge positions,**

---

[33] Steven C. Bottemiller, MAI and Marvin L. Wolverton, PhD, MAI, "The Price Effects of HVTLs on Abutting Homes," *The Appraisal Journal* (Winter 2013): 49.
[34] Ibid., 49.

clipping, middle position, and diagonal position—that could be useful for appraisal report writing."[35]

Also cited in this article were the results of the Bottemiller and Wolverton study, which included separate analyses of Portland and Seattle from 2005 to mid-2007. The Portland study indicated the price effect of abutting a HVTL transmission line was found to be -1.65% less, while the Seattle study was -2.429% less for the average priced treatment group. An additional study of higher priced houses in Seattle indicated a -11.225% difference for the abutting properties.

This study is typical of the other published studies in that the data was generally collected from the same subdivision. In this study, "the data collection protocol involved identifying a sufficient number of HVTL-abutting sales in each study area (Portland and Seattle) then searching for at least two, and preferably three, non-abutting sales from the same neighborhood and time frame as similar in square footage, lot size and other elements of comparison as possible. This resulted in a 'treatment' sample of HVTL-abutting homes and a 'control' sample of non-HVTL-abutting homes."[36]

The problem with staying in the same subdivision for both the affected and control sales, is that all the sales are effected to some degree and what is being measured is the relative difference between the two groups. The fact that both groups are effected is particularly true with respect to structures the size of HVTLs and cell towers. A more accurate measurement would have been to compare competing subdivisions with and without the dis-amenity.

---

[35] Ibid., 49.
[36] Ibid.,50.

# CELL TOWER AND

# TRANSMISSION LINE EASEMENT DAMAGE STUDY

## EASEMENT VALUE THEORY

Real estate ownership consists of a bundle of rights that can be held by one entity or many. A right or interest in property is an estate. The most basic is a fee simple estate, the unimpaired ownership of real estate subject only to the governmental limitations of escheat, eminent domain, taxation, and police owner. When the bundle of rights is split into two or more parties, lesser estates are created. This is the case when a contractual limitation on a fee simple ownership is created by the establishment of an easement.

Easement is defined as: "An interest in real property that conveys use, but not ownership, of a portion of an owner's property. Access or right of way easements may be acquired by private parties or public utilities. Governments dedicate conservation, open space, and preservation easements."[37]

An easement is usually the right to perform a specific action on a particular land parcel, or portion of a parcel of land, without owning the underlying fee. An easement is an estate, which may be severed from the bundle of rights and can be defined in terms of time and space.

Easements can be either temporary or permanent. Permanent, or perpetual easements are generally acquired for electrical transmission lines, sewer, water, and other utility lines; highways; and other public facilities.

In terms of space, an easement may be defined as subsurface, surface, or overhead. Subsurface easements are required to install sewer lines, water lines, communication lines, and

---

[37] Appraisal Institute, *The Dictionary of Real Estate Appraisal,* 4th ed. (Chicago: Appraisal Institute, 2002), 90.

tunnels; common surface easements allow for drainage, flowage, railroads, and highways. Aviation, air, noise and line-of-sight easements are overhead easements.

The owner of an easement is said to have a dominant estate, while the owner of the underlying fee is said to have a subservient estate. In other words, the interest in the land held by the owner of the easement dominates the rights retained by the fee owner. Although the fee owner may retain the right to use the land encumbered by the easement, this use may not interfere with the easement owner's use of the property for the purposes specified in the written easement.

Before an easement can be valued the following impacts of the acquisition must be determined: (1) the loss of present utility, (2) the loss of future utility, (3) the accessory rights to be acquired, and (4) the obligations of the parties.

The damage to land due to the imposition of an easement can range from 0% to 100% of the easement area's fee value.[38] The degree of damage resulting from the same type of easement can vary greatly depending on the highest and best use of the land. Another factor that can affect the degree of damage caused by the easement acquisition is the location of the easement in relationship to the boundary line of the larger parcel.

## ELECTRIC TRANSMISSION LINE EASEMENT VALUATION METHODOLOGY

An electric transmission line easement is a fraction of the bundle of rights that comprise the total fee and is a distinct estate that typically includes only those property rights necessary for the construction, operation and maintenance of an electric power transmission line.

Transmission lines are used for transporting power from the generating station to the point where a local distribution system takes over, and consequently, carry higher voltages than distribution lines. Typical voltage for transmission lines range from a low of 69,000 volts to over 700,000 volts.

---

[38] J. D. Eaton, *Real Estate Valuation in Litigation* (Chicago, Appraisal Institute, 1995), 259.

Power from transmission lines is delivered to a distribution point, or substation, where high voltages are reduced by step-down transformers to levels for distribution to local customers.

Unlike distribution lines, which share easements with other utilities and make extensive use of public right of ways, transmission line easements are typically single purpose with different design features and operating characteristics. Market reaction to dissimilar transmission line easements varies depending on these differences.

Legal considerations include property rights which comprise the estate or easement and right of way. Most rights are set forth within the easement deed. "In most instances the value of the right of way area cannot be equivalent to its fee value as though unencumbered, because many property rights are retained by the fee owner and the position that the remaining fee rights are of no value is not fully realistic. Further, remaining values will vary greatly from one type of property to another. For example, the relationship between remaining values in the easement right of way historically is higher in agricultural and rural areas than in more densely developed urban areas."[39]

An electric power transmission line easement and right of way appraisal involves three principle elements of value:

1. The value of the easement and/or right of way which includes all the property rights and obligations that make-up *the easement estate.*

2. The value of the underlying fee *within the right of way* which includes *all other property rights not in the easement estate.*

3. The value of *the remainder of the total ownership outside the right of way* and not encumbered by the easement.[40]

---

[39] Louis E. Clark, Jr., MAI and F.H. Treadway, Jr.., MAI, *Impact of Electric Power Transmission Line Easements on Real Estate Values* (Chicago, The American Institute of Real Estate Appraisers ,1972), 6.
[40] Ibid., 9.

Estimating the effects upon value caused by transmission line easements is the degree of reduction of the rights remaining to the fee owner will be, in most instances, the value of the easement rights conveyed.[41]

Among the methods of valuation of electric transmission line easements are the before and after method, as well as the easement-to-fee simple (EFS) value ratio obtained from paired sales analysis to multiple regression analysis depending on the amount of data available. Most studies have found no price effect for residences abutting a high voltage transmission line (HVTL).[42] However, these results can only be interpreted as data specific.

The first step in the analysis is to *identify the taking area* with regard to its width, site placement on the parent tract, proximity to set-back lines, and proximity to available building area. The width of an easement affects its value in proportion to the width of the parent tract. For example, when a portion of an easement is located within the required street set-back lines, its adverse influences are somewhat neutralized. An easement that extends along perimeter boundaries would probably have less impact than an easement that crosses the middle of the parent tract. The angle at which the easement crosses the site may notably increase severance damages. For example, an easement that extends diagonally across its parent tract rather than parallel to front and rear property line would likely cause increased severance damage because the remainder of the parent tract would be divided into irregular and less functional shapes (i.e., triangular rather than functional shapes or rectangular).[43]

The second step is *to identify placement and extent of the power line infrastructure*. These include power poles, towers, and other supporting structures such as guy wires which can significantly affect the value of both a servient estate and a dominant estate (i.e., easement interest). The appearance of infrastructure (e.g., size and height of support structure and number of power

---

[41] Ibid., 18.
[42] Marvin L. Wolverton, PhD, MAI and Steven C. Bottenmiller, "Further Analysis of Transmission Line Impact on Residential Property Values," *The Appraisal Journal* (July 2003): 244-252.
[43] Gordon G. Green, "Easement-to-Fee-Simple Value Ratios for Electric Transmission Line Easements: A Common Sense Approach," *The Appraisal Journal* (July 1992): 401-402.

4F1EDA0B-4BF7-4A04-B33D-CCBCCF272EE3 : 000039 of 000047

lines) affects property values more than the amount of voltage. Adverse effects of easement placement may be compounded depending on the size and extent of transmission line infrastructure.[44]

The third step is to *identify the easement's impact on the bundle of rights and highest and best use.* By comparing a servient estate's bundle of right before and after the easement taking provides a means of quantifying the impact of the easement. The bundle of rights is severable; its four major rights are possession, control, quiet enjoyment, and disposition. Depending on the wording of an easement and its intended use, one or all of the rights may be affected.

The highest and best use of an easement area and parent tract builds on the concept of the bundle of rights. The four tests of highest and best use are whether a use is physically possible, legally permissible, financially feasible, and maximally productive. The four tests should be applied to an easement area and parent tract before and after the taking. If the taking of an easement initiates a change in the type, rather than the extent, of use of the parent tract, the resulting severance damage probably will be substantial. If maximal productivity is the only factor diminished by the taking of an easement, severance damages may be minimal. If the highest and best use remains unaffected, just compensation, if any will apply only to the easement.[45]

The fourth step is to *correlate all factors of influence* outlined previously as they are interrelated and may increase or decrease in magnitude depending on their relationship.

The final steps of the research process are *to identify target research areas, search comparable sales for like properties, and select paired sales.*

The following steps constitute the analysis process for this valuation technique. *1. Calculate the taking area and parent tract sizes. 2. Apply adjustments to paired sales. 3 Derive land-value diminution ratio of encumbered parent tract. 4. Estimate easement-to-parent-tract-size ratio. 5.*

---

[44] Ibid., 402-403.
[45] Ibid., 403-404

*Calculate the (Easement fee simple) EFS ratio. 6. Prorate diminution. 7. Apply EFS ratio to land value.*[46]

## DAMAGE ANALYSIS

The following study was prepared in 2012 for a 345 kV HVTL easement acquisition by Kentucky Utilities in Cecilia, Hardin County, Kentucky. In addition to comparable sales analysis from Hardin County, additional data from Bourbon, Woodford, Laurel, Bell, Marshall and Calloway Counties are included.

The following studies indicate a range of diminution in value as a result of the encumbrance of HVTL on agricultural properties. The amount of damage is the result of the degree to which HVTL impact the utility and degree of trespass upon the bundle of rights. The studies indicate a range of diminution in value from minimal impact to a maximum of approximately 50.0 percent depending on the placement of the easement within the property.

## NO DAMAGE STUDY

Sale No. 35 represents a 196.967-acre tract fronting on Rineyville-Big Spring Road with a significant amount of woodland. The subject transmission line extends along the rear property line and indicates no diminution in value.

## UNDER 20.0 PERCENT STUDY

This example may not be indicative of the market since the purchaser was the City of Elizabethtown and the property is encumbered with gas easements. However, Sale No. 36 sold for $4,929 per acre encumbered with subject transmission line possibly along the rear of

---

[46] Ibid., 405-407.

the tract (easement has not been recorded). The graph indicates an unencumbered value of $5,600 per acre with a diminution in value of **–12.0 percent**.

TWENTY PERCENT STUDY

As indicated on the After Value Comparable Sales spreadsheet, Sale No. 32 adjoins an East Kentucky Power substation along the primary road frontage on Owsley Road and the portion of the 93.106 acre tract along this road is encumbered by a 100.0 foot wide power line easement. The sale price for the tract was $4,744 per acre. Based on the land sales graph the value without the encumbrances would have been $6,000 per acre. The difference in values indicates diminution in value of **–20.9 percent**.

"An Impact Study on the Effect of High Voltage Power Lines on Rural Southwestern Indiana" prepared by Appraisal Group One (Kurt C. Kielisch, ASA, IFAS, SR/WA, W/W-AC) and dated July 12, 2010 concluded: "The HVTL impact range had a low of -5% and a high of -36%, with an average of 20%. This range and conclusion of average impact corresponds very well with the previous studies we have completed on agricultural and recreational land in the State of Wisconsin." ..."These studies indicated that the impact of the HVTL is dependent on the location of the of the HVTL on the property with the most sever impact found when the HVTL has a diagonal bisection of the property and the least severe impact when the HVTL nips the corner of a parcel."

THIRTY PERCENT STUDY

Sale No. 31 represents the adjoining property at the east property line of the Jent farm. This tract, which was encumbered by the subject transmission line diagonally through the middle of the farm, sold for $3,815 per acre. Based on the graph, the estimated value of the farm without the encumbrance and partially platted along the road frontage for single-family dwellings was $5,400 per acre. This property indicates a diminution in value of –30.0 percent.

FORTY PERCENT STUDY

Sale No. 34 is a 103.875-acre farm on the Salt River Road encumbered by the subject power line project. The transmission line traversed this farm through the northeast half of the farm. This farm sold for $2,453 per acre and the graph indicates a before value of $4,100 per acre, or a diminution of –40.2 percent.

An industrial example of the effect of a HVTL compares two tracts opposite each other on Sherwood Park Drive in Somerset, KY.  A 0.540 acre tract of which the rear half of the tract was that was encumbered by an HVTL sold for $7,800, or $0.33 per square foot on September 2 4, 1990 for $0.33 per square foot. The 0.753-acre tract on the opposite side of the road sold on October 8, 1990 for $20,000, or $0.61 per square foot.  Though the latter tract was larger, the former had superior road frontage and utility. The difference between the sale prices was **-46.77 percent.**

FIFTY PERCENT STUDY.

A farm on the Military Pike in Fayette County immediately west of the Woodford County line was divided into three tracts and sold over a three-year period.  A high voltage transmission line traversed all three tracts to varying degrees. The first tract to sell was 4552 Military Pike on September 25, 2008. The grantor was Ruth Manley and the grantee was Patrick Higginbothan. The transfer is recoded in Deed Book 2834, Page 400. The tract was improved for horses with two converted tobacco barns and perimeter plank fencing and a 1900 frame dwelling. The improvements are estimated to contribute $200,000. The sale price for the 104.430 acres was $1,357,590, or $13,000 per acre. The estimated contributing value of land was $11,085. The front northeast corner of the property was encumbered by the transmission line. Although the front portion of the property was encumbered, the improvements were unaffected.

The second tract to sell was at 4153 Military Pike. This 111.76-acre tract is on the north side with frontage also on Ft. Springs Pinkard Pike. The farm sold on January 15,

2010 for $1,660,200, or $14,855 per acre and the transaction is recorded in Deed Book 3184, Page 028. The grantor was Ironwood Farms, Inc. and the grantee was Little Texas Farm, LLC. The farm was improved with a two-story dwelling constructed in 1960 and a tobacco barn. The improvements are estimated to contribute $207,500 with a contributing land value of $13,000. The front southwest corner of the farm was minimally encumbered by the easement.

The third tract adjoined the second tract to the west and the transmission line encumbered this tract to the maximum extent possible traversing it diagonally through the middle of the farm from the front southeast corner to the rear northwest corner. The double transmission line was supported by double metal supports. The 77.56-acre farm sold on November 29, 2010 for $510,000, or $6,576 per acre. The farm was minimally improved with a tobacco barn. The transaction is recorded in Deed Book 2980. Page 578. The difference between the second tract, representing minimal if any damage, and the first tract that represents minor encumbrance is -14.73 percent of damage. The difference between the second sale and the third sale representing maximum encumbrance is **-49.42 percent** of damage.

## HARDIN COUNTY INDICATIONS OF BUYER RESISTANCE

There are indications within the subject neighborhood of buyer resistance to the HVTL as evidenced by subdivisions that are encumbered that have not sold despite the fact that the lots have been exposed to the market for several years.

The Huffer subdivision and the Willyard subdivision are immediately east of the Jent property on the north and south side of the Rineyville-Big Spring Road, respectively.

The Willyard subdivision is at the corner northwest corner of Blueball Road and Rineyville-Big Spring Road as well as on the south side of the latter road. The subdivision consists of 14 lots that sold from 2005 until 2011, with an absorption rate of 2 lots per year. The transmission line did not encumber any of these lots.

4F1EDA0B-4BF7-4A04-833D-CCBCCF272EE3 : 000044 of 000047

On the other hand, the Huffer subdivision, which is also on both sides of the Rineyville-Big Spring Road and adjoins the Willyard subdivision to the west is significantly encumbered by the subject transmission line. This subdivision consists of 16 lots of which only 6 lots have sold from 2007 to 2011, or 1.2 lots per year. The transmission line diagonally traverses the remaining lots, which have yet to sell.

## BOURBON COUNTY CELL TOWER DAMAGE CASE STUDY

Although precise damage cannot be extracted from this paired sales comparison of an improved farm encumbered by a cell tower, the comparison indicates buyer resistance and damage as a result of proximity to vertical structures similar to HVTL.

A 76.97-acre tract improved with a 2,000 square foot dwelling at 259 Brentsville Road in Paris, KY sold on December 19, 2007 for $605,000, or $7,860 per acre (DB 273-558). The grantor was R. Bruce Wornall and the grantee was Absquared, LLC. The farm had been on the market since July 2, 2004 and was originally listed for $799,000. The farm was irregular in shape with only 79.20 linear feet of road frontage.

The farm was encumbered with a 2,718.16 linear foot long 20.00 foot wide access easement to a 3.821 acre cell tower site at the rear of the property and within approximately 1,000 linear feet of southeast of the dwelling. The cell tower site had previously been sold to Central Kentucky Cellular Telephone Company (Cellular One) in 1992. (The site was subsequently sold to Crown Castle GT Company, LLC in 2000).

The farm was directly across Brentsville Road from a 74.084 acre unimproved tract, that sold on July 13, 2007 for $740,000, or $10,000 per acre. The grantor was Beverly B. Baldwin, the grantee was William E. Streaker; and the transaction is recorded in Deed Book 271, page 458. This farm had 1,212.00 linear feet of road frontage.

Based on the land value of the 74.084 acre tract of $10,000 per acre and adjusted 20.00 percent for road frontage, the indicated value for the land is $8,000 per acre, or $646,000. The

4F1EDA0B-4BF7-4A04-B33D-CCBCCF272E5E3 : 000045 of 000047

resulting contributing value for the residence based on the asking price of $799,000 is $153,000, or $76.50 per square foot, which is reasonable for this log structure. Assuming that the asking price of $799,000 represents the value without the encumbrance of the cell tower, the difference between this value and the sale price of $605,000 is **-24.28 percent.**

SUPPORTING DAMAGE STUDIES

The results of this study is also supported by other damage studies prepared by this office including:

*Yellow Creek Concerned Citizens v. Middlesboro Tannery*: this study estimated the effect of tannery contamination on 350 properties along Yellow Creek, Bell County, KY after city water had replaced well water. The analysis found that there was residual diminution in value of **-16.5 percent** for improved properties and **-22.00 percent** for unimproved land.

*James E. Sullivan, et al v. Board of Regents, et al*: this study estimated the effect of Animal Waste Fermentation Project at the Organic Pasteurization Plant at North Farm of Murray State University on Sullivan's Executive Par 3 Golf Course and Sports Center and on-site residential improvements in Murray, KY. The results of the study were that the golf course was damaged 28.00 percent and the residential improvements had diminution in value from **-21.0 to -28.0 percent.**

*Terry Powell, et al v. Tosh, et al*: this study estimated the diminution of value as a result of proximity to 5,000 hog confined animal feeding operations (CAFOs) in Benton, Kentucky. The results of the study were that improved properties adjacent to or within immediate proximity to hog farms are damaged approximately **-50.0 percent**. Properties from approximately 0.5 mile to 1.25 miles are damaged **-25.0 percent**. Farms beyond 1.25 miles to 1.5 miles and/or those adjacent to agricultural fields that may experience routine manure spreading are damaged approximately **-10.0-12.0 percent**. Vacant land was damaged **-40.0 percent.**

*Terrence G. Kerschner, et al v. Burley Oil Company, et al:* this study estimated the effect of Leaking Underground Gasoline Tanks on Country Lane Estates, Frankfort, KY. The results of this study was that the property most affected by the leak was damaged **-100.0 percent**, with adjoining properties damaged **-50.0 percent** and the remaining properties within the subdivision were damaged **-20.0 percent**.

4F1EDA0B-4BF7-4A04-B33D-CCBCCF272EE3 : 000047 of 000047